IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIELLA PRICE, Administratix of the Estate of Anthony Reaves,<br><br>         Plaintiff,<br><br>   v.<br><br>CHARLES STEINMETZ, et al.,<br><br>         Defendants. | CIVIL ACTION<br>NO. 19-3225 |

## OPINION

**Slomsky, J.**                                                                **July 12, 2022**

## I.   INTRODUCTION

On July 24, 2019, Plaintiff Daniella Price, acting as Administratix of the Estate of Anthony Reaves, filed this action against Defendants Charles Steinmetz, Javier Garcia, and Timothy Doherty.[1]  (See Doc. No. 1.)  On August 16, 2021, the parties stipulated to dismiss Defendant Doherty from this action, leaving Steinmetz and Garcia as the only remaining Defendants.  (See Doc. No. 26.)  At issue here is Defendants Steinmetz and Garcia's Motion for Summary Judgment (Doc. No. 31).  For reasons that follow, the Court will deny Defendants' Motion (Doc. No. 31).

## II.   BACKGROUND

### A. Operation Bennett Trifecta

This action arises from Reaves's role as a confidential informant for the Pennsylvania State Police and his untimely death.  (See Doc. Nos. 31 at 3; 32 at 7–8.)  Throughout 2015, the Pennsylvania State Police were investigating illicit and violent drug activity in Chester, Pennsylvania, ("Operation Bennett Trifecta" or "OBT").  (See Doc. No. 32 at 8–9.)  Defendants

---

[1]    Doherty's name is incorrectly spelled on the court docket as "Dougherty."  (See Doc. No. 26.)

Steinmetz and Garcia (collectively, "Defendants"), troopers with the Pennsylvania State Police, were actively involved in the OBT investigation.  (See id.)

As part of the OBT investigation, on or around September 22, 2015, Reaves was surveilled purchasing cocaine from James Townsend, who was a primary subject of the investigation.  (See Doc. Nos. 31-2 ¶¶ 11, 14; 32-1 ¶ 104.)  Reaves was not a target in the OBT investigation and Defendants were not aware of him until they intercepted communications between him and Townsend.  (See Doc. No. 31-2 ¶ 12.)  After Reaves left his meeting with Townsend, Defendants instructed Chester City Police to stop his car.  (See Doc. Nos. 31-2 ¶ 14; 32 at 12.)  Chester City Police did so and Reaves was found to be in possession of cocaine.  (See Doc. Nos. 31-2 ¶ 14; 32 at 12.)  Chester City Police confiscated the cocaine from Reaves but let him leave without arresting him.  (See Doc. No. 31-2 ¶ 18; 32 at 12.)  The parties dispute whether Reaves indicated a willingness to cooperate with the Pennsylvania State Police during this encounter.  (See Doc. Nos. 31-2 ¶ 17; 32-1 ¶ 17.)

Nevertheless, following his encounter with law enforcement, Mr. Reaves attended a meeting on or around October 14, 2015 with Defendants where he agreed to cooperate and be a confidential informant for the Pennsylvania State Police.  (See Doc. No. 31-2 ¶¶ 19–25, Doc. No. 32 at 12.)  Defendants explained to Reaves that, by agreeing to cooperate, he was not escaping prosecution for the drugs found in his possession, but that his cooperation would be taken into consideration by the prosecutor.  (See Doc. No. 31-1 ¶ 20.)

From late 2015 to early 2016, Reaves served as a confidential informant for the Pennsylvania State Police and engaged in a total of four controlled purchases of drugs under their direction.  (See Doc. No. 31-2 ¶¶ 32, 34, 55, 60.)  Two of the controlled purchases—occurring on

October 15, 2015 and November 16, 2015—were from Townsend and part of the OBT investigation.  (See id. ¶ 34.)

In August 2015, before Reaves's initial encounter with Pennsylvania State Police, a grand jury was empaneled to determine if charges should be brought in connection with the OBT investigation.  (See id. ¶ 39.)  Part of the evidence eventually submitted to the grand jury included Reaves's initial purchase from Townsend.  (See Doc. No. 31-2 ¶ 41.)  Further, Defendants and their unit learned that Reaves's name was being used before the grand jury and that he would ultimately be included in the presentment.  (See Michael Skahill Dep. at 88:16–89:2; 93:11–97:22.)  As a result, Defendants knew that the OBT co-defendants would eventually learn of Reaves's identify as a confidential informant once discovery in the criminal proceeding commenced.  (See id.)

### B. Controlled Purchases from Caulk

In early 2016, the Pennsylvania State Police were investigating Rasheen Caulk, another known drug trafficker in the Chester area, but not involved in the OBT investigation.  (See Doc. No. 31-2 ¶¶ 27, 47, 52.)  During the meeting with Defendants in which Reaves agreed to work as a confidential informant, Reaves told Defendants that Caulk was one of the people he purchased cocaine from.  (See id. ¶¶ 26.)  Defendants were aware of Caulk's activities before Reaves mentioned his name, but previous attempts by the Pennsylvania State Police to apprehend him had been unsuccessful.  (See id. ¶¶ 27, 54.)  Eventually, Defendant Garcia contacted Reaves about making controlled purchases from Caulk and Reaves agreed to do so.  (See id. ¶ 49.)

On March 21, 2016, Reaves made his first controlled buy from Caulk on Lindbergh Boulevard in Philadelphia.  (See id. ¶¶ 55, 58.)  Defendant Garcia met with Reaves immediately

before the transaction.  (See id. ¶ 56.)  Following the transaction, Caulk drove off in his vehicle and the Pennsylvania State Police were unable to follow him.  (See id. ¶ 59.)

The Pennsylvania State Police arranged a second controlled buy from Caulk to take place on April 20, 2016.  (See id. ¶ 60.)  Prior to this buy, persons in Defendants' unit decided that law enforcement would stop Caulk shortly after the transaction concluded and would arrest him.  (See id. ¶ 61; see also Doc. No. 32-1 ¶ 61; Skahill Dep. at 150:13–153:6.)  The parties dispute which members of Defendants' unit were involved in the planning of the second controlled purchase, but both parties agree that Defendant Garcia knew of the plan.  (See Doc. Nos. 31-2 ¶ 61; 32-1 ¶ 61.)  Defendant Steinmetz testified that he does not recall being involved in the planning leading up to the second controlled sale by Caulk, but he did work on the surveillance team for the transaction.  (See Charles Steinmetz Dep. at 99:17–19; 91:16–22.)  Reaves, however, was not informed of the plan to arrest Caulk after the transaction with Reaves.  (See Doc. No. 31-2 ¶ 66.)

Reaves arranged to meet Caulk for the second controlled purchase at the same location in Philadelphia where the first purchase took place.  (See id. ¶ 67.)  The Pennsylvania State Police, working with the United States Drug Enforcement Agency, set up surveillance around the area.  (See id. ¶ 63.)  However, after Reaves arrived at the location, but before Caulk arrived, Caulk contacted Reaves and informed him that the transaction would occur instead in Chester.  (See id. ¶ 68.)  Reaves informed Defendant Garcia of the change in location and the surveillance team moved to the new location.  (See id. ¶¶ 68–69.)

After the transaction occurred, Caulk again drove away from the scene in his vehicle.  (See id. ¶ 71.)  This time, he was followed by law enforcement and stopped before he could reach the highway.  The stop occurred approximately five to ten minutes after the transaction concluded.  (See id. ¶¶ 71–72.)  Caulk did not possess anything illegal when he was stopped by law

enforcement, but he still was arrested, taken into custody, and charged with drug related offenses. (See id. ¶ 73.)  Reaves did not conduct any further controlled buys for the Pennsylvania State Police after Caulk was arrested.  (See id. ¶ 74.)

**C. Reaves's Murder**

Meanwhile, on March 15, 2016, the grand jury empaneled in connection with the OBT investigation recommended charges against fifteen individuals, including Reaves.  (See id. ¶ 42.) On April 20, 2016, the same day that Reaves conducted his second controlled purchase from Caulk, Defendants Garcia and Steinmetz signed and filed a criminal complaint against Reaves based on the grand jury's presentment.  (Doc. No. 32 at 16; Ex. R.)  On April 22, 2016, Reaves was arrested and charged pursuant to the grand jury recommendation.  (See id. ¶ 45.)  Shortly thereafter, Reaves posted bail.  (See id. ¶ 46.)

On or around July 1, 2016, the City of Chester Police Department informed Corporal Michael Skahill, Defendants' immediate supervisor, who had also been involved in the second controlled purchase from Caulk, that they had heard about a bounty placed on Reaves's life and that it was suspected to have originated from Caulk.  (See id. ¶¶ 1, 61, 81.)  Skahill thereafter informed Reaves and Leno Thomas, who Reaves had retained as his criminal defense attorney following his arrest, about the threat.  (See id. ¶¶ 75, 82.)

In November 2016, a Delaware County Court of Common Pleas Judge, presiding over the Bennett Trifecta prosecution, granted a motion filed by one of Reaves's co-defendants, ordering the prosecution to identify to the defendants any co-defendants who had cooperated with law enforcement.  (See id. ¶ 89.)  As a result, Reaves's name was disclosed to his co-defendants' attorneys.  (See id. ¶ 90.)

On March 31, 2017, a meeting was held between Reaves, Defendants Steinmetz and Garcia, Skahill, Thomas, and Paul Reddel, who was the lead prosecutor in the OBT prosecution at the time.  (See id. ¶ 93.)  The parties dispute the extent to which the individuals at this meeting discussed the possibility of having Reaves enter a witness protection program.  (See Doc. Nos. 31-2 ¶ 94; 32-1 ¶ 94.)

On July 31, 2017, Reaves, as required, appeared in the Delaware County Court of Common Pleas and pled guilty to the charges against him.  (See Doc. No. 31-2 ¶ 98.)  After the hearing, Reaves drove to southwestern Philadelphia and parked near residences known as Korman Suites.  (See id. ¶ 99.)  Tragically, less than an hour after Reaves left the court, he was ambushed by two unknown individuals and was shot to death.  (See id. ¶ 99.)  His murder still remains unsolved.  (See id. ¶¶ 99–100.)

**D. This Litigation and Defendants' Motion for Summary Judgment**

On July 24, 2019, Plaintiff filed the instant action, alleging: (1) a violation of due process and equal protection pursuant to 42 U.S.C. § 1983 against Defendants Steinmetz and Garcia (Count I); (2) a violation of due process and equal protection pursuant to 42 U.S.C. § 1983 against Defendant Doherty (Count II);[2] (3) wrongful death against all Defendants (Count III); and (4) survival action against all Defendants (Count IV).  (See Doc. No. 1 at 49–82.)

On November 1, 2021, Defendants filed their Motion for Summary Judgment (Doc. No. 31), requesting the Court to grant judgment in their favor on Plaintiff's § 1983, wrongful death, and survival claims.  On November 22, 2021, Plaintiff filed a Response in Opposition (Doc. No. 32) and on November 29, 2021, Defendants filed a Reply (Doc. No. 33).

---

[2]    As noted earlier, Doherty is no longer Defendant and Count II has been dismissed.  (See Doc. No. 26.)

On January 20, 2022, the Court held a hearing on Defendants' Motion (see Doc. No. 42). At the hearing, Plaintiff's counsel informed the Court that Plaintiff was no longer pursuing her equal protection claim.  (See Doc. No. 42 at 30 ¶¶ 13–17.)  Thus, Plaintiff's remaining claims against Defendants include her due process claim, which is grounded on the "state-created danger" theory of liability, and her wrongful death and survival claims, which are contingent on the success of her due process claim.

After the hearing, the Court ordered the parties to submit additional briefing on Plaintiff's state-created danger claim and the qualified immunity defense argued by Defendants.  (See Doc. No. 42 at 50–52.)  Both parties submitted their supplemental briefs on April 4, 2022 (Doc. Nos. 46, 47).  The Motion for Summary Judgment is now ripe for disposition.  For the following reasons, the Court will deny Defendants' Motion (Doc. No. 31).

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In reaching this decision, the Court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a "sufficient evidentiary basis on which a reasonable jury could find for the non-moving party[.]"  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir, 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it must "have the potential to alter the outcome of the case."  Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of

material facts exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216 (internal quotations omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issue of fact, but to determine whether there exist any factual issues to be tried. See Anderson, 477 U.S. at 247–49. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250–51.

## IV.    ANALYSIS

The issues that remain at this stage of the proceeding concern: (1) Plaintiff's state-created danger claim, (2) Defendants' claim that qualified immunity shields them from liability, and (3) Plaintiff's wrongful death and survival claims. The Court will focus here primarily on Defendants' claim of qualified immunity since it necessarily incorporates Plaintiff's state-created danger claim and since Plaintiff's wrongful death and survival claims are contingent upon the success of Plaintiff's state-created danger claim.

### A. Qualified Immunity

To begin, Plaintiff asserts a claim against Defendants for violation of Mr. Reaves's due process rights pursuant to 42 U.S.C. § 1983. This claim is predicated on a state-created danger theory, as explained infra. Section 1983 provides in relevant part:

8

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Defendants contend to the contrary that they did not violate Reaves's due process right. (See Doc. No. 31 at 5–16.)  They also assert that they are entitled to qualified immunity.  (See id. at 18–19.)

"Qualified immunity shields officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dennis v. City of Philadelphia, No. 19-2390, 2021 WL 5458432, at *4 (3d Cir. Nov. 23, 2021) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Thus, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law."  Spady v. Bethlehem Area School Dist., 800 F.3d 633, 637 (3rd. Cir. 2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (second alteration in original)).  Qualified immunity has a two-prong test:

> [W]hen analyzing a qualified immunity claim, we consider "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right is 'clearly established' at the time of the official's conduct."

Dennis, 2021 WL 5458432, at *4 (citing L.R. v. Sch. Dist. of Philadelphia, 836 F.3d 235, 241 (3d Cir. 2016)).  "Courts may begin their consideration with either prong."  Spady, 800 F.3d at 637 (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).  The Court will begin with the second prong: whether the right at issue was clearly established.

### 1. Whether the Right was Clearly Established

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). It is not necessary that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741.

A court "must first frame the precise contours of that right." Spady, 800 F.3d at 638. In doing so, a court is "not to define clearly established law at a high level of generality." Id. at 638 (citing al-Kidd, 563 U.S. at 742). The court instead "must define the right allegedly violated at the appropriate level of specificity." Id. at 638 (citing Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012)).

The precise framing of the constitutional right at issue in this case, where a state-created danger claim is being asserted, was the central issue discussed in the parties' supplemental briefs. (See Doc. Nos. 46, 47.) According to Defendant, the right at issue should be defined as "the right to have no action taken by the state actors that could in any way increase the likelihood that the [confidential informant]'s identity would be known or any action that would decrease the anonymity of the [confidential informant]."[3] (Doc. No. 46 at 2.) Plaintiff, on the other hand,

---

[3]     Defendants' framing of the constitutional right here appears to be irreconcilable with Roviaro v. United States, 353 U.S. 53 (1957). In Rovario, the Supreme Court held that the Government has a limited "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Id. at 59 (citations omitted). The Supreme Court further held that "no fixed rule with respect to disclosure is justifiable" and that the determination "calls for balancing the public interest in the flow of information against the individual's right to prepare his defense" depending on the circumstances of the case. Id. at 62. However, the Supreme Court did note that:

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential

asserts that the right should be defined as the "right [of confidential informants] to be free from the unreasonable disclosure of their identities in circumstances that increase their risk of harm." (Doc. No. 47 at 2.)

Plaintiff's framing of the constitutional right at issue in this case is more on the mark, but not quite there. But Defendants' framing of the constitutional right at issue is essentially the same as the one the Third Circuit rejected in Estate of Lagano v. Bergen Cnty. Prosecutor's Office, 769 F.3d 850 (3d Cir. 2014).

There, an informant was similarly shot and killed after law enforcement officials disclosed his identity to members of organized crime. See Lagano, 769 F.3d at 852–53. The estate of the informant brought suit against the county prosecutor's office and its chief detectives alleging, inter alia, a state-created danger claim. See id. at 853. The district court dismissed the estate's complaint, in part because it found that the chief of detectives was protected by qualified immunity. See id. at 853–54. In doing so, the district court defined the right at issue as "a confidential informant's constitutional right to nondisclosure." Id. at 859 (internal quotations omitted).

---

to a fair determination of a cause, the privilege must give way.

Id. at 60–61.

Rovario creates, to some extent, a sliding scale as to when a confidential informant's identity must be revealed. In this case, Defendants, as law enforcement officers, were well aware that under certain circumstances a confidential informant's identity must be revealed. Knowing this, law enforcement must exercise good judgment during their investigations in handling informants. But the law does not prevent Defendants from in any way increasing the likelihood that a confidential informant's identity would be disclosed because, under Rovario, it must be disclosed under certain circumstances. Thus, an issue in this case is whether the manner in which Defendants used Reaves and the timing of the arrest of Caulk made it more likely that Reaves's identity would be disclosed, thereby subjecting him to harm he otherwise would not have faced.

On appeal, the Third Circuit rejected the district court's framing of the constitutional right and vacated the district court's decision on qualified immunity.  See id.  Specifically, the Third Circuit stated that:

> We cannot endorse the District Court's unduly narrow construction of the right at issue, or its statement that the right was not clearly established.  It has been clearly established in this Circuit for nearly two decades that a state-created danger violates due process.  See Kneipp v. Tedder, 95 F.3d 1199, 1211 (3d Cir.1996) (holding that state-created danger theory is "viable mechanism for establishing a constitutional violation.").  That we have not applied the state-created danger theory in the context of a confidential informant is not dispositive on the qualified immunity defense.  As the Supreme Court explained in Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."  Id. at 741, 122 S.Ct. 2508 (internal citation and quotation marks omitted).  Thus, the Estate can overcome Mordaga's qualified immunity defense without proving that we have previously issued a binding decision recognizing a state-created danger in the context of the disclosure of a confidential informant's status, and the District Court erred in requiring it to do so.

> The focus of the qualified immunity inquiry is on the allegations made by the Estate.  Specifically, the question is whether the facts averred by the Estate fall within the elements of the state-created danger theory, and whether "it would be clear to a reasonable officer" that the alleged disclosure was unlawful under the circumstances.  Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Id.

Thus, the right at issue in this case can most aptly be described as: The right of a confidential informant to be free from unreasonable actions taken by law enforcement which would result in them knowing that they are subjecting a confidential informant to a significant risk of harm from a defendant who could readily identify a person who cooperated against him.

Plaintiff cites decisions from this Circuit and other Circuits to support the notion that the right of a confidential informant to be free from unreasonable actions by law enforcement which endanger the informant is clearly established.  See, e.g., Lagano, 769 F.3d at 859 ("Specifically, the question is whether the facts averred by the Estate fall within the elements of the state-created

danger theory, and whether it would be clear to a reasonable officer that the alleged disclosure was unlawful under the circumstances.") (internal quotations omitted); Cherry v. City of Philadelphia, 216 F. App'x 205, 207 (3d Cir. 2007) (agreeing with the district court's holding that a police commissioner "would be liable if he had in fact directed the police to identify Cherry as a cooperating witness and in doing so caused her shooting"); Monfils v. Taylor, 165 F.3d 511, 518 (7th Cir. 1998) (deputy chief of detectives was "never [] entitled to qualified immunity" where he assured an assistant district attorney that the tape recording of an informant's tip to law enforcement would not be released to the perpetrator the informant had reported on, but did not follow through, thereby "creat[ing] a danger Monfils would not have otherwise have faced" when the perpetrator subsequently obtained the recording, discovered the informant's identity, and murdered him); Nelson v. City of Madison Heights, 845 F.3d 695, 702 (6th Cir. 2017) ("Officer Wolowiec's act of disclosing Hilliard's identity to the very individual the state was supposed to protect that identity from placed Hilliard in special danger by increasing the likelihood that the private actor would deprive her of her liberty interest in personal security."); Velez-Diaz v. Vega-Irizarry, 421 F.3d 71, 81 (1st Cir. 2005) ("We leave open the question whether, nonetheless, the state may violate substantive due process as to cooperating witnesses if it takes certain actions, such as sending a cooperating witness to what the state knows would be his certain death.")

While these cases may not be completely identical to the facts at hand, such a finding is "not necessary" to demonstrate that the law is clearly established on this issue. Hope, 536 U.S. at 741. It is sufficient to say that these cases would make it "clear to a reasonable officer" of the type of conduct that would be considered unlawful. Saucier, 533 U.S. at 202. And, in this case, it would be clear to Defendants that it would be considered unlawful for them to take any unreasonable actions that they knew would place Reaves in significant danger by making his

identity readily known to Caulk, especially since Defendants were aware that a bounty had been placed on Reaves's life.  Thus, the right at issue here is clearly established.

### 2. Constitutional Violation

The second part of the qualified immunity analysis requires the Court to consider whether Plaintiff has sufficiently alleged that Defendants violated Reaves's constitutional right.  As noted supra, the relevant claim for purposes of the qualified immunity analysis is Plaintiff's state-created danger claim.  Plaintiff argues that the decision was made to use Reaves in connection with the investigation and arrest of Caulk because Defendants were cognizant of Reaves's "expiring shelf life" as a confidential informant and wanted to get as much use out of him as possible, without regard to his safety.  (Skahill Dep. at 88:17.)  As a result, according to Plaintiff's theory, Defendants placed Reaves in a position where his identity as a confidential informant would have to be given to Caulk, which created a danger that Reaves otherwise would not have faced.  Defendants maintain to the contrary that their actions were simply proper law enforcement techniques.

To sustain a state-created danger claim, a plaintiff must show that: (1) Reaves "suffered a foreseeable and fairly direct harm"; (2) "the state acted with a degree of culpability that shocks the conscience"; (3) Reaves "was a foreseeable victim . . . or a member of a discrete class of persons potentially harmed by the state's actions"; and (4) "the state affirmatively used [its] authority to create[] a danger or make [Reaves] more vulnerable to danger had [it] not acted at all."  Mears v. Connolly, 24 F.4th 880, 883–84 (3d Cir. 2022) (internal quotations omitted) (second to last alteration added) (citing Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006)).  The parties agree that the first and third elements of the state-created danger claim are not in dispute. (See Doc. Nos. 31 at 7; 32 at 22; 33 at 3–4 n.1.)  The parties also seem to agree that the focus of

this case is on the second element, while Defendants maintain that due consideration should also be directed towards the fourth element.  (See Doc. Nos. 31 at 7; 32 at 22; 33 at 3–4 n.1.)

Regarding the second element, whether Defendants acted with a degree of culpability that shocks the conscience, the Third Circuit has established a multi-tiered analysis to determine the standard by which Defendants' actions are to be judged:

> We have observed that "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." Estate of Smith v. Marasco, 430 F.3d 140, 153 (3d Cir. 2005) (quoting Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)).  If the circumstances are highly pressurized, it is necessary to show intentional harm by the state actor; however, if the state actor has the benefit of deliberation, then all the plaintiff needs to show is deliberate indifference.  Id.  Moreover, in cases "involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" the relevant inquiry is whether the state actor "consciously disregarded a great risk of harm," with the possibility that "actual knowledge of the risk may not be necessary where the risk is 'obvious.'"  Sanford v. Stiles, 456 F.3d 298, 310 (3d Cir. 2006).

Mann v. Palmerton Area Sch. Dist., 872 F.3d 165, 171 (3d Cir. 2017), as amended (Sept. 22, 2017).

The crux of Plaintiff's state-created danger claim is the decision by Defendants to use Reaves to make controlled purchases from Caulk and to arrest Caulk immediately after the second controlled purchase, alerting him to the fact that Reaves set him up.  The record is clear that these decisions were made before the sale occurred.  (See Doc. Nos. 32-1 ¶ 61; 32-1 ¶ 61; see also Skahill Dep. at 150:13–153:6.)  The only split-second decision made was the decision to move the surveillance team from southwest Philadelphia to Chester after Caulk changed the location of the sale.  (See Doc. No. 31-2 ¶¶ 67–69.)  The plan to use Reaves and to arrest Caulk after the sale was completed, however, was already established.  Therefore, since Defendants had the benefit of deliberation in their decision, the deliberate indifference standard applies.

Defendants have failed to demonstrate the absence of any genuine dispute of material fact as to whether they acted with deliberate indifference in using Reaves to make the Caulk controlled

purchases and in the decision to arrest Caulk immediately after the second controlled purchase was completed.  In other words, in viewing the facts in the light most favorable to Plaintiff as the non-movant, there are genuine disputes of material fact about whether Defendants were deliberately indifferent to the danger in which they placed Reaves.

In this regard, there are questions regarding Defendants' intentions in using Reaves in the controlled purchases from Caulk.  Defendants knew that Reaves's name would soon be disclosed in the OBT prosecution and that his identity as a confidential informant would soon be compromised.  (See Skahill Dep. at 93:11–97:22; Javier Garcia Dep. at 37:13–39:15.)  If he was compromised, Reaves would no longer be useful as a confidential informant.   Therefore, Defendants were acting under pressure to extract as much use from Reaves as possible to assist in the prosecution of other persons involved in selling illicit drugs.  One such person was Caulk.  He was not part of the OBT investigation and had evaded attempts in the past by law enforcement to gather evidence of his illegal drug dealing and to prosecute him.  (See Doc. 31-2 ¶ 54; Garcia Dep. at 76:3–9.)  Thus, they turned to Reaves who knew Caulk.  (See Doc. No. 31-2 ¶ 26.)  Reaves made two buys from Caulk, but there is a genuine dispute of material fact of whether there was a need to stop and arrest Caulk so quickly after the second buy, which resulted in Caulk realizing that he was set up by Reaves.  Testimony from former Deputy Attorney General Reddel, who worked with Defendants in connection with the OBT prosecution, casts doubt on the legitimacy of the decision to arrest Caulk immediately after the second controlled purchase was completed.[4]

---

[4]    The cases Defendants cite in support of their assertion that their actions do not shock the conscience and were simply typical techniques used by law enforcement are distinguishable and thus Defendants' argument is unpersuasive.  (See Doc. Nos. 31 at 19; 46 at 5); see also Walter v. Pike Cnty., Pa., 544 F.3d 182 (3d Cir. 2008); Matican v. City of New York, 524 F.3d 151 (2d Cir. 2008).

In Walter, the Third Circuit held that law enforcement did not act with deliberate indifference when they arrested a suspect at the house of the man who reported the suspect to law

(See Paul Reddel Dep. at 32:21–34:19; 68:7–69:7.)  If Caulk had not been arrested immediately after the buy, Reaves's identity as confidential informant may not have been known to Caulk at that point.

Put simply, there is sufficient evidence from which a jury could reasonably draw the conclusion that the decision to use Reaves in connection with Caulk, and the manner and timing in which Caulk was arrested, was not the product of legitimate strategic decision-making by law enforcement, but the result of an eagerness to apprehend an elusive target and, in order to achieve this outcome, to use a confidential informant whose usefulness to law enforcement was soon to expire.[5]  This led to the expedited revelation that Reaves was a cooperator, significantly increasing

---

enforcement.  See 544 F.3d at 193.  The court held that law enforcement "had to balance the risks of arresting Stacy at the Walters' house against the risks of arresting him at his own house, where they believed (rightly, as it turned out) that Stacy had an arsenal of weapons at his disposal."  Id.  The court went on to state that it was "loath to dictate to the police how best to protect themselves and the public, especially when our ruling could be taken to require officers to use riskier methods than their professional judgment demands."  Id. at 194 (internal quotations omitted) (citing Matican, 524 F.3d at 159).

This is unlike the facts presented here, where the primary concern to use Reaves in connection with the Caulk arrest was not out of concern for the safety of members of the Pennsylvania State Police.  Further, there was no evidence in Walter suggesting that law enforcement may have had ulterior motives for arresting the suspect in that case in the manner in which they did like there is here with Reaves's "expiring shelf-life" as a confidential informant.  (Skahill Dep. at 88:17.)

Matican is also distinguishable for similar reasons.  As with Walter, there was no concern about the actual intent of law enforcement.  Secondly, in Matican, the Second Circuit analyzed whether the actions of law enforcement shocked the conscience under a different standard from the one currently employed in the Third Circuit.  See Matican, 524 F.3d at 158–59.  In fact, the Second Circuit expressly refused to analyze whether the officers in that case acted with deliberate indifference.  See id. at 158.

5    Although Defendants rely on the fact that the Court of Common Pleas Judge ordered the disclosure of Reaves's identity, which, according to Defendants, "supersedes any previous actions taken attributable to" them, Defendants overlook the fact that there are genuine disputes of material fact regarding their motivation and use of Reaves in connection with the Caulk buys and to arrest of Caulk immediately after the second buy.  (Doc. No. 31 at 14.)  These decisions and the actual transactions with Caulk occurred months before the Judge ordered the disclosure of Reaves's identity.  But Plaintiff's claim here is based on the Caulk transactions

the risk of harm to him.[6]  A reasonable jury could conclude that the decisions of Defendants amount to a deliberate indifference to the risk posed to Reaves.

Further, the parties dispute what occurred at the meeting between Reaves, Defendants, Reddel, and Thomas after it was discovered that a bounty had been placed on Reaves's life.  The parties dispute whether there was a discussion about the possibility of Reaves entering a witness protection program and it is unclear whether Reaves turned down an offer to enter such a program.[7] (See Doc. Nos. 31-2 ¶ 94; 32-1 ¶ 94.)  Clearly, such an offer by Defendants to Reaves could weigh against a finding that they were deliberately indifferent to the danger posed to Reaves.

Finally, the parties dispute the extent to which Defendants Garcia and Steinmetz were even involved in the second controlled purchase from Caulk and the decision to arrest Caulk on the scene.  (See Doc. Nos. 31 at 9–10; 32 at 24 n.4.)  Such disputed facts are material to the disposition of this case, as Defendants' personal involvement in the alleged constitutional violation is

---

and not the fact that Reaves's identity was eventually disclosed by order of a judge in the OBT prosecution.  For summary judgment purposes, the focus is on the Caulk transactions, although it may be relevant at trial for the jury know about the disclosure ordered by the court in the OBT prosecution because Reaves's murder remains an unsolved homicide.

[6]  To date, Reaves's murder remains unsolved.  (See Doc. No. 31-2 ¶ 100.)  Thus, it has not been proven that Caulk was responsible for Reaves's murder or even that Caulk definitely knew that Reaves had set him up after the second transaction that resulted in Caulk's arrest.  However, there is evidence demonstrating that law enforcement suspected that the bounty placed on Reaves's life had originated from Caulk.  (See id. ¶ 81.)  Therefore, when viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that it was indeed Caulk who was behind Reaves's murder.

[7]  According to Defendants, Leno Thomas, Reaves's counsel, testified that there was no discussion about any witness protection program at this meeting.  (See Doc. No. 31-2 ¶ 94.) Plaintiff, however, disputes whether the testimony from Thomas cited by Defendants actually concerns witness protection.  (See Doc. No. 32-1 ¶ 94.)  Plaintiff appears to be correct regarding the portion of Thomas's testimony cited by Defendants.  (See Leno Thomas Dep. at 83:18–84:9.)  However, there are other portions of Thomas's testimony where he appears to say that a witness protection program was never discussed with Reaves.  (See Thomas Dep. at 46:8–20; 49:23–50:23.)  Plaintiff also asserts that Reaves's family believes that he turned down offers to enter a protection program out of concern for their safety.  (See Doc. No. 32 at 17.)

necessary to establish liability under Section 1983.  See Ewing v. City of Philadelphia, No. 20-3170, 2021 WL 1581186, at *8 (E.D. Pa. Apr. 21, 2021) ("To state a claim against a defendant in his or her individual capacity under Section 1983, a plaintiff must establish that the defendant had personal involvement in committing the alleged violation.").  Further, it is also necessary to show that Defendants acted affirmatively in using their authority to place Reaves in danger to satisfy the fourth element of the state-created danger test.  See Mears, 24 F.4th at 884.

In sum, genuine disputes of material fact exist.  Accordingly, Defendants are not entitled to summary judgment on the Count I state-created danger claim.  Viewing the facts in the light most favorable to Plaintiff, facts have been adduced that Defendants by their deliberate indifference created a danger that Reaves would be significantly harmed as a result of the manner in which his identity was disclosed to Caulk.  Furthermore, because Defendants have not demonstrated at the summary judgment stage that there was no constitutional violation, and that the constitutional violation was not "clearly established," Defendants are not entitled to qualified immunity.[8]

## V.    CONCLUSION

For all the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 31) on Counts I, III, and IV will be denied.  An appropriate Order follows.

---

[8]   Since Plaintiff's wrongful death and survival claims are contingent upon her Section 1983 claim, Defendants also are not entitled to summary judgment on those claims.  See Christmann v. Link, No. 19-1707, 2021 WL 1269917, at *5 (E.D. Pa. Apr. 6, 2021) (citing Sullivan v. Warminster Twp., 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011).